# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 48337-8-II |
| Respondent/Cross Appellant. | |
| v. | |
| MICHAEL J. MORIARTY, | UNPUBLISHED OPINION |
| Appellant/Cross Respondent. | |

MELNICK, J. — Michael J. Moriarty appeals his conviction for assault in the second degree. The State cross-appeals and argues that the trial court erred by ordering an alternative sentence. We conclude that the trial court did not err by accepting Moriarty's jury waiver or by finding Moriarty did not act in self-defense. Although the prosecutor's comments were improper, they were not prejudicial. Sufficient evidence supported the conviction. We also conclude that the trial court erred by imposing an alternative sentence. We affirm in part, reverse in part, and remand for resentencing.

## FACTS

On June 12, 2015, Annie Booth went to the beach and let her unleased dog out of her car. From a distance of approximately twenty feet, she observed a 76-year-old man, Moriarty, flailing a knife at her dog. The dog barked at Moriarty. Moriarty repeatedly screamed, "Do you want to f[***]ing die?" Report of Proceedings (RP) (Sept. 8, 2015) at 79. Moriarty stood approximately three or four feet away from the dog.

Booth observed Moriarty move towards her dog and reach for the dog's collar with one hand while he held the knife in his other hand. Booth ran in Moriarty's direction and yelled "at the top of [her] lungs" that the dog would not bite him and to move away. RP (Sept. 8, 2015) at 80. She was terrified that Moriarty would stab the dog in the throat. The dog continued to bark at Moriarty.

When Booth reached Moriarty and the dog, she approached Moriarty from behind, put her hands on his shoulder, and tried to move him away from the dog. Then Moriarty turned around, "looked [her] dead in the eye and he tried to stab [her] in the face." RP (Sept. 8, 2015) at 83. Booth put her hand up for protection, and Moriarty stabbed her hand with his knife. She threw Moriarty on the ground, took her dog, ran back to her car, and called the police.

Moriarty disputed Booth's account of the incident. He claimed that as he came down from some rocks on the beach, the dog ran towards him "as fast as a bullet." RP (Sept. 8, 2015) at 151. The dog approached him "with its mouth wide open, its teeth glistening, snarling, barking." RP (Sept. 8, 2015) at 154. Moriarty pulled out his knife and crouched down to the ground. Moriarty tried to prick the dog's nose, but was unsuccessful. He was "frightened to death." RP (Sept. 8, 2015) at 187. The dog stayed just out of reach of Moriarty and circled him. Moriarty was completely focused on the dog when Booth started hitting his back. Moriarty did not hear Booth call off the dog or say a word. Booth grabbed him and threw him forward. He landed face first in the sand. Then, Booth jumped on his back and sat on him. Moriarty was only concerned about defending himself against the dog, not Booth. He denied attempting to stab or injure Booth. He claimed when Booth pushed him to the ground, the knife went into the sand.

The State charged Moriarty with assault in the first degree with a deadly weapon enhancement.[1]

## I.  JURY TRIAL WAIVER

The trial court held a hearing on Moriarty's motion to waive a trial by jury.  Moriarty told the trial court he could not hear very well.  After the court provided him with a hearing device, Moriarty told the court, "I can hear you great."  RP (Sept. 4, 2015) at 3.  Moriarty signed a written waiver of jury trial, where he stated, "I have been informed and fully understand that I have the right to have my case heard by an impartial jury selected from the county where the crime(s) is alleged to have been committed."  Clerk's Papers (CP) at 17.  Moriarty told the trial court that he signed the jury waiver of his own free will after reviewing it with his attorney.  The trial court consented to hear the case without a jury.  The trial court found that the jury waiver form was "read by or to [Moriarty], signed by [Moriarty] present with his lawyer.  The court [found] that [Moriarty] knowingly, intelligently, voluntarily waives his right to a jury trial."  RP (Sept. 4, 2015) at 5.

## II.  CLOSING ARGUMENTS

In closing argument, the prosecutor stated:

> And then the conflicting testimony begins with regard to Mr. Moriarty.  Mr. Moriarty is asserting some type of self-defense here, but I don't think that he's demonstrated a need to defend himself.  I don't think that there's evidence that he had the need to defend himself.  And even if there is, I believe the State has overcome the burden that he established some sort of self-defense or that he had some necessity to defend himself.  He describes the dog never coming to him.  He describes the dog never getting within more than arm's reach.  None of that would necessitate the self-defense.
>
> More importantly, I think Ms. Booth was entitled to protect her property, in particular the dog.  I think the ample testimony here is that in fact on that date, Mr. Moriarty when he was confronted, Judge, I think the evidence would show that he was angry.  I think he's minimized here on the stand, and I think the Court can see

---

[1] RCW 9A.36.011(1)(a); RCW 9.94A.602; RCW 9.94A.533(4)(a).

that. I think he was basically angry that he was being disrupted by an animal, and he decided that he was going to come off that rock and he was going to kill that dog. I think that what the evidence has shown is that when he got down off that rock and he got to that sand, that he simply made a decision that he was going to cut that dog. And I think when he did that, he probably did not pay attention to the other folks around him. But that doesn't diminish the fact that when Ms. Booth pulled him off of that dog, he turned around and he looked at her and he stared at her, and that's when he took that knife and tried to stab her in the face. Now, he tells you that didn't happen. But I think this Court can gauge the testimony as it heard it from the witnesses. Gauge the credibility of it, the manner in which they testified. And I think the evidence shows that she in fact was stabbed that day by Mr. Moriarty, that he did so with the intent to inflict great bodily harm. I don't think you stab someone in the face or attempt to stab someone in the face without that intent. She testified very clearly that he turned around and looked at her and from about her waist—his waist, rather, took that knife with a twisting motion and a stabbing motion and went right at her face. She was able to get her hand up in time to block it, and that caused the injury. But nevertheless, his intent was to inflict bodily harm against Ms. Booth. He did so with that knife.

. . . . I think you had somebody who was and I think the evidence shows that he had somebody who wanted to get at that knife and was going to make a decision here. . . . By his testimony, he wasn't able to even nick the dog. That's not a self-defense issue. That's a guy who is angry and has just had it with this dog. And I think that's what this evidence showed.

*His testimony, frankly, Judge, does not appear to be credible to me. It appears that he is trying to tell a story.* Even the idea that this woman cut herself, that officers need to go find a knife from her, that just doesn't fit with the evidence. That doesn't fit with the testimony from the officers, what they observed. And that 911 call, you know, that this happened right then. Your Honor, I think that's pretty telling of what really happened, [be]cause that's right immediately after this thing happened.

And I think this evidence has proved beyond a reasonable doubt that he committed this crime. *I hope the Court will convict him of it*.

RP (Sept. 8, 2015) at 207-10 (emphasis added).

In Moriarty's closing argument, he argued that he was not defending himself against Booth, he was defending himself against the dog, and it was not a normal self-defense case.

In rebuttal, the prosecutor argued,

And I just don't think, Judge, anyone reaches down toward a dog when they're afraid of it. I think they take a much more defensive posture and certainly don't put their face and hands near it. . . . I don't think the evidence bears it out and *would like the Court to find him guilty*.

4

RP (Sept. 8, 2015) at 222 (emphasis added). Moriarty did not object to these statements.

III.    TRIAL COURT'S FINDINGS OF FACT AND CONCLUSIONS OF LAW

After a bench trial, the trial court entered findings of fact and conclusions of law. The findings and conclusions pertinent to this appeal are summarized as follows.

Booth approached Moriarty, yelling that Moriarty was making the situation worse. Moriarty tried to grab the dog's collar and stab it in the neck. The dog continued to bark and snarl at Moriarty. Once Booth reached Moriarty, she grabbed him by the shoulder and pulled him away from the dog. Moriarty looked at Booth and tried to stab her in the face. Booth managed to put her hand up, and the knife struck her hand. Booth struck Moriarty, but "he was never in fear of assault or injury" by Booth. Suppl. CP at 93. Moriarty denied stabbing Booth in the hand. The trial court found Booth's version of events credible.

The trial court found Moriarty not guilty of assault in the first degree, but guilty of assault in the second degree. It did not find that Moriarty was armed with a deadly weapon for purposes of the enhancement.

The trial court concluded that "Moriarty did not claim self-defense from [Booth], only that he was defending himself against her dog. Therefore, there is no self-defense claim to consider as to the assault upon [Booth]." Suppl. CP at 94.

IV.    SENTENCE

On October 23, 2015, the trial court entered the judgment and sentence. The trial court sentenced Moriarty to four months of confinement and 12 months of community custody. The trial court also ordered that 30 days of the confinement be converted to 240 hours of community service. The State did not object to this sentence. The trial court subsequently amended the

5

judgment and sentence and sentenced Moriarty to a total of four months of confinement, with 30 days converted to electronic home monitoring.

The trial court stayed the 30 days of electronic home monitoring pending the outcome of this appeal. Both Moriarty and the State appeal.

## ANALYSIS

I.   JURY TRIAL WAIVER

Moriarty argues that the trial court erred by accepting his jury trial waiver. He argues that the waiver was constitutionally invalid because he did not understand it, and the trial court should have queried him further before accepting his waiver. We disagree.

A.   Legal Principles

We review a jury trial waiver de novo. *State v. Benitez*, 175 Wn. App. 116, 128, 302 P.3d 877 (2013). "The record must adequately establish that the defendant waived his right knowingly, intelligently, and voluntarily." *Benitez*, 175 Wn. App. at 128. "When examining the record, we consider whether the defendant was informed of his constitutional right to a jury trial." *State v. Ramirez-Dominguez*, 140 Wn. App. 233, 240, 165 P.3d 391 (2007).

CrR 6.1(a) requires cases to be tried by a jury unless the defendant files a written waiver of a jury trial and receives the consent of the court. There are no specific requirements for the written waiver, only that it is a personal expression of the defendant's waiver. *State v. Pierce*, 134 Wn. App. 763, 771, 142 P.3d 610 (2006). "A written waiver 'is strong evidence that the defendant validly waived the jury trial right.'" *Benitez*, 175 Wn. App. at 128 (quoting *Pierce*, 134 Wn. App. at 771).

A defendant's attorney's representation that the defendant's waiver is knowing, intelligent, and voluntary is relevant. *Benitez*, 175 Wn. App. at 128. An extensive colloquy on the record

6

between the trial court and the defendant is not necessary, instead "only a personal expression of waiver from the defendant" is required. *Pierce*, 134 Wn. App. at 771. "As a result, the right to a jury trial is easier to waive than other constitutional rights." *Benitez*, 175 Wn. App. at 129.

B.       The Trial Court Properly Accepted the Jury Waiver

Moriarty argues that the record fails to establish a waiver because he only had "a chance" to read the written waiver and the court "should have grasped that Moriarty had some issues understanding communications and/or responding." Br. of Appellant at 13.

Moriarty misconstrues the record. After Moriarty told the trial court he could not hear very well, the court provided him with a hearing device. Moriarty told the court, "I can hear you great." RP (Sept. 4, 2015) at 3. The trial court asked Moriarty if he signed the jury waiver form of his own free will after reviewing it with his attorney. Moriarty answered in the affirmative. The trial court informed him that once the waiver was accepted, he would be "stuck" with the trial court hearing the case. RP (Sept. 4, 2015) at 5. Moriarty told the trial court that he understood. In Moriarty's waiver of jury trial he stated, "I have been informed and fully understand that I have the right to have my case heard by an impartial jury selected from the county where the crime(s) is alleged to have been committed." CP at 17. The trial court found that the jury waiver form was "read by or to [Moriarty], signed by [Moriarty] present with his lawyer. The court finds that [Moriarty] knowingly, intelligently, voluntarily waives his right to a jury trial." RP (Sept. 4, 2015) at 5.

Here, Moriarty received the advice of his attorney and submitted a written jury trial waiver. The written waiver stated that Moriarty had been informed of his right to a jury trial, he consulted with his lawyer about his decision to waive the rights, and he "freely and voluntarily [gave] up [his] right to be tried by a jury and request trial by the court;" a clear personal expression of waiver

7

from Moriarty. CP at 17. The trial court informed Moriarty that he had the right to a unanimous verdict by 12 people. The trial court informed Moriarty that by waiving this right, only the judge would decide his case. Moriarty told the trial court that he understood his jury trial right and waived it freely and voluntarily. Therefore, we conclude that the trial court did not err by accepting Moriarty's jury waiver.

II.    SELF-DEFENSE

Moriarty argues that the trial court erred because it did not apply the law of self-defense to his case. He seems to argue that an individual may defend himself against an animal, and thus, the trial court erred by concluding there was no self-defense claim. We disagree.

A.    Standard of Review

To determine whether sufficient evidence supports a conviction, we view the evidence in the light most favorable to the State and determine whether any rational fact finder could have found the elements of the crime beyond a reasonable doubt. *State v. Engel*, 166 Wn.2d 572, 576, 210 P.3d 1007 (2009). "Specifically, following a bench trial, appellate review is limited to determining whether substantial evidence supports the findings of fact and, if so, whether the findings support the conclusions of law." *State v. Homan*, 181 Wn.2d 102, 105-06, 330 P.3d 182 (2014). We "must defer to the trier of fact for purposes of resolving conflicting testimony and evaluating the persuasiveness of the evidence." *Homan*, 181 Wn.2d at 106.

We treat unchallenged findings of fact as verities on appeal. *Homan*, 181 Wn.2d at 106. We review challenges to a trial court's conclusions of law de novo. *State v. Gatewood*, 163 Wn.2d 534, 539, 182 P.3d 426 (2008).

8

B.      The Trial Court Properly Considered Self-Defense

Moriarty did not challenge any of the trial court's findings of fact related to his self-defense claim.  Because they are considered verities, we need only consider whether the trial court's findings of fact support its conclusion of law on the issue of self-defense.

To prove self-defense, a defendant must show "'(1) the defendant subjectively feared that he was in imminent danger of death or great bodily harm; (2) this belief was objectively reasonable; [and] (3) the defendant exercised no greater force than was reasonably necessary.'"  *State v. Werner*, 170 Wn.2d 333, 337, 241 P.3d 410 (2010) (quoting *State v. Callahan*, 87 Wn. App. 925, 929, 943 P.2d 676 (1997)).

The trial court found that Moriarty did not fear Booth.  He was only concerned about defending himself against her dog.  In rejecting his self-defense claim, the trial court concluded that Booth defended himself against the dog, but not against Booth.

Moriarty's argument is without merit.  The trial court's findings of fact clearly support its conclusion that there was no self-defense claim against Booth.  Moriarty cites to *State v. Burk*, 114 Wash. 370, 195 P. 16 (1921), in which a defendant tried to justify killing an animal to defend his property, which is clearly distinguishable from the present case.  Therefore, we conclude that the trial court properly concluded self-defense did not apply.

III.    PROSECUTORIAL MISCONDUCT

Moriarty argues that the prosecutor committed misconduct in closing argument for three reasons: he provided his personal opinion on the case; he undermined Moriarty's presumption of innocence; and he misstated the law of self-defense.  We disagree.

A.      Standard of Review

"Prosecutorial misconduct may deprive a defendant of his constitutional right to a fair trial." *In re Pers. Restraint of Glasmann*, 175 Wn.2d 696, 703-04, 286 P.3d 673 (2012).  An appellant claiming prosecutorial misconduct must demonstrate that the prosecutor's conduct was both improper and prejudicial.  *State v. Emery*, 174 Wn.2d 741, 760, 278 P.3d 653 (2012).  When the defendant failed to object to the improper comments at trial, the defendant must show that the comments were "so flagrant and ill intentioned that an instruction could not have cured the resulting prejudice."  *Emery*, 174 Wn.2d at 760-61.  The appellant must show that (1) no curative instruction would have eliminated the prejudicial effect, and (2) the misconduct resulted in prejudice that had a substantial likelihood of affecting the verdict.  *Emery*, 174 Wn.2d at 761.  We "should focus less on whether the prosecutor's misconduct was flagrant or ill intentioned and more on whether the resulting prejudice could have been cured."  *Emery*, 174 Wn.2d at 762.

B.      The Prosecutor Did Not Commit Misconduct

1.      Personal Opinions

Moriarty argues that the prosecutor committed misconduct because his argument was "rife with personal opinions" and the prosecutor expressed his personal desire for the court to convict Moriarty.  Br. of Appellant at 24, 27.  He challenges nearly every sentence in the prosecutor's closing argument.

"In the context of closing arguments, the prosecuting attorney has 'wide latitude in making arguments to the jury and prosecutors are allowed to draw reasonable inferences from the evidence.'"  *State v. Fisher*, 165 Wn.2d 727, 747, 202 P.3d 937 (2009) (quoting *State v. Gregory*, 158 Wn.2d 759, 860, 147 P.3d 1201 (2006), *overruled on other grounds by State v. W.R.*, 181 Wn.2d 757, 336 P.3d 1134 (2014)).  We review the prosecutor's comments during closing

argument in the context of the entire argument, the issues in the case, the evidence addressed in the argument, and the jury instructions. *State v. Sakellis*, 164 Wn. App. 170, 185, 269 P.3d 1029 (2011). Some statements, standing alone, may sound like an expression of a personal opinion by the prosecutor. *State v. McKenzie*, 157 Wn.2d 44, 53, 134 P.3d 221 (2006). However, when considered within "'the total argument, the issues in the case, the evidence discussed during the argument, and the court's instructions, it is usually apparent that counsel is trying to convince the jury of certain ultimate facts and conclusions to be drawn from the evidence.'" *McKenzie*, 157 Wn.2d at 54 (quoting *State v. Papadopoulos*, 34 Wn. App. 397, 400, 662 P.2d 59 (1983)). "Prejudicial error does not occur until such time as *it is clear and unmistakable that counsel is not arguing an inference from the evidence, but is expressing a personal opinion.*" *McKenzie*, 157 Wn.2d at 54 (quoting *Papadopoulos*, 34 Wn. App. at 400).

"Although it is improper for a prosecutor to vouch for a witness's credibility, a prosecutor has wide latitude in closing argument to draw reasonable inferences from the evidence and may freely comment on witness credibility based on the evidence." *State v. Lewis*, 156 Wn. App. 230, 240, 233 P.3d 891 (2010) (footnote omitted). "Thus, closing argument does not constitute improper vouching unless it is clear that the prosecutor is not arguing an inference from the evidence, but instead is expressing a personal opinion about credibility." *Lewis*, 156 Wn. App. at 240. However, a prosecutor may not assert in argument his personal belief in the accused's guilt. *State v. Monday*, 171 Wn.2d 667, 677, 257 P.3d 551 (2011). "In other words, there is a distinction between *the individual opinion of the prosecuting attorney, as an independent fact*, and *an opinion based upon or deduced from the testimony in the case.*" *McKenzie*, 157 Wn.2d at 53 (quoting *State v. Armstrong*, 37 Wash. 51, 54-55, 79 P. 490 (1905)).

In addition, in "the absence of evidence to the contrary, we presume that the judge in a bench trial does not consider improper matters or inadmissible evidence in rendering a verdict." *In re Det. of H.N.*, 188 Wn. App. 744, 765, 355 P.3d 294 (2015), *review denied*, 185 Wn.2d 1005 (2016).

Here, the prosecutor prefaced many of his statements during closing and rebuttal argument with "I think," which arguably is improper. But, if a prosecutor uses the phrase "I think" in "the context of recounting evidence and reasonable inferences from the evidence that could support the [fact-finder's] conclusion that [the defendant] was not credible," it is not flagrant and ill-intentioned misconduct. *State v. Jackson*, 150 Wn. App. 877, 889, 209 P.3d 553 (2009); *see also State v. Hoffman*, 116 Wn.2d 51, 94-95, 804 P.2d 577 (1991) (holding that prosecutor's phrasing argument in terms of "I think" or "I think the evidence shows," to which trial counsel did not object, is not prosecutorial misconduct if the arguments are based on evidence or reasonable inferences).

In the closing arguments, the prosecutor argued that "His testimony, frankly, Judge, does not appear to be credible to me. It appears that he is trying to tell a story." RP (Sept. 8, 2015) at 210. In so arguing, the prosecutor improperly gave his personal opinion of the case and Moriarty's credibility. He argued that, in his opinion, Booth was credible and Moriarty was not.

However, because Moriarty did not object to the statements in closing argument or rebuttal, he must show that (1) no curative instruction would have eliminated the prejudicial effect, and (2) the misconduct resulted in prejudice that had a substantial likelihood of affecting the verdict. *Emery*, 174 Wn.2d at 761.

The improper comments were not flagrant and ill-intentioned. The prosecutor even reminded the trial court that it would be responsible for "gaug[ing] the testimony as it heard it from

12

the witnesses." RP (Sept. 8, 2015) at 208. The court and not a jury decided the facts. We conclude that no prejudice resulted from the comments particularly because this trial was to the bench.

### 2. Presumption of Innocence

Moriarty also argues that the prosecutor undermined the presumption of innocence in his closing argument by asserting his own personal opinion into closing.

We do not consider the issue because Moriarty fails to provide us with any citation to legal authority or the record, or argument to support his assertion. Under RAP 10.3(a)(4) and (6), an appellant's brief must include "assignments of error, arguments supporting the issues presented for review, and citations to legal authority" and references to relevant parts of the record. *State v. Harris*, 164 Wn. App. 377, 389 n.7, 263 P.3d 1276 (2011). We need not consider arguments that are not developed in the briefs and for which a party has not cited authority. *Harris*, 164 Wn. App. at 389 n.7.

### 3. Self-Defense

Finally, Moriarty argues that the prosecutor misstated the law on self-defense because he misstated the facts and presented the law on self-defense in a way that relieved the State of any burden to disprove the defense. Moriarty argues that the closing argument "trivialized" his self-defense claim. Br. of Appellant at 28.

Moriarty claims that the trial court "made no reference whatsoever to Moriarty's defense and simply made conclusions as to the credibility of witnesses." Br. of Appellant at 28. This assertion does not accurately reflect the trial court's conclusions of law. The trial court concluded that "Moriarty did not claim self-defense from [Booth], only that he was defending himself against her dog. Therefore, there "[was] no self-defense claim to consider as to the assault upon [Booth]."

13

Suppl CP at 94. It is clear that the trial court considered the argument and rejected it because Moriarty did not assert the defense against the person he assaulted.

In closing, the prosecutor only argued that a theory of self-defense was not supported by Moriarty and was not applicable. This argument did not shift the burden of proof. The prosecutor argued that Moriarty had not demonstrated a need to defend himself against Booth. The prosecutor further argued that even if the claim for self-defense had been supported by the evidence, the State had sustained its burden to prove the absence of self-defense beyond a reasonable doubt. This argument did not trivialize Moriarty's theory of the case; it rebutted his theory. Therefore, we conclude that the prosecutor did not commit any misconduct in his closing arguments.

## IV.    SUFFICIENCY OF THE EVIDENCE

Moriarty argues insufficient evidence supports his conviction. The State argues sufficient evidence supports the conviction because of Booth's testimony. We disagree with Moriarty.

Moriarty assigned error to each finding of fact by number, but in the argument section of his brief, he only focuses on findings of fact 1.3, 1.5, 1.7, and 1.8. Because Moriarty does not state why each finding of fact he assigned error to was not supported by the evidence, we need only address those he argued were error and whether the findings support the conclusions of law. *See Homan*, 181 Wn.2d at 106.

Finding of fact 1.3 stated,

Booth had let her dog out of her Jeep. As she was getting things out of the vehicle, she heard her dog barking. [Booth] looked up to see . . . Moriarty, climbing down off the rocks towards her dog. As [Moriarty] came off the rocks into the soft sand, her 55 pound stalky dog came towards him barking and with his teeth bared. The dog was not on a leash. . . . [Moriarty] retrieved a folding knife from his pocket . . . [he] opened the knife and went towards [Booth's] dog, saying "do you want to f[***]ing die?"

14

Suppl. CP at 92. This finding is supported by substantial evidence. Booth observed her dog bark at Moriarty, who flailed a knife at the dog screaming, "Do you want to f[***]ing die?" over and over. RP (Sept. 8, 2015) at 79. Moriarty testified that he came down from the rocks into the sand and the 55 pound dog came towards him with its teeth bared.

Finding of fact 1.5 stated that "Moriarty testified that he never reached for the dog and only crouched lower in order to 'prick' the dog on the nose. He testified that he did not reach for the dog. The dog honored the knife and stayed approximately one foot away from the knife and continued to bark and snarl." Suppl. CP at 92.

This finding is supported by substantial evidence. Moriarty testified that he crouched down while holding his knife so he could be on the same level as the dog. He testified that the dog stayed approximately 15 or 18 inches away from him and he did not reach for the dog. He also testified that the knife was effective in keeping the dog at bay from him.

Finding of fact 1.7 stated, "Moriarty agreed that the dog was not approaching him, but he feared the dog may give him rabies given an experience he'd had with a dog that had bitten him in the leg more than 20 years ago in a foreign country." Suppl. CP at 92.

This finding is supported by substantial evidence. Moriarty testified that his prior experience of being bitten by a rabid dog was in his mind at the time of the incident.

Finally, finding of fact 1.8 stated "Booth ran towards [Moriarty] and once she reached him, she grabbed [his] shoulder and pulled him away from the dog." Suppl. CP at 92. This finding is supported by substantial evidence. Booth testified that she ran towards Moriarty and grabbed his shoulder in an attempt to pull him away from her dog.

Another unchallenged finding is that "Moriarty looked directly at Booth and attempted to stab her in the face." Suppl. CP at 92.

RCW 9A.36.021 requires the State to prove: "(1) A person is guilty of assault in the second degree if he or she, under circumstances not amounting to assault in the first degree: (a) Intentionally assaults another and thereby recklessly inflicts substantial bodily harm; or . . . (c) Assaults another with a deadly weapon."[2]

The trial court's findings of fact clearly support its conclusion of law that Moriarty committed the crime of assault in the second degree.

## CROSS-APPEAL ANALYSIS

The State argues that the trial court erred by authorizing an alternative sentence of electronic monitoring because Moriarty was convicted of a violent crime. We agree.

### I.   PRESERVATION OF ISSUE FOR APPEAL

Moriarty argues that we should decline to review the State's cross-appeal because the State failed to provide a record sufficient for our review and the State invited any error when it filed the motion to amend Moriarty's sentence, the trial court granted the amendment, and the State did not object to the amendment. We disagree.[3]

### II.   MOOTNESS

Moriarty argues that the State's argument is moot because Moriarty has completed his court-ordered sentence. We disagree.

---

[2] The trial court did not identify in its conclusions of law under which prong of RCW 9A.36.021 it decided the case. The State argues that Moriarty assaulted Booth with a deadly weapon, but the trial court specifically concluded that Moriarty was not armed for the purposes of the enhancement. We address both likely applicable prongs of the statute.

[3] Moriarty initially argues that we should decline to review the State's cross-appeal because the State failed to provide a sufficient record for this court to review and the State invited the error. First, on our order, the State supplemented the record so we could review this issue. Therefore, we do not address whether the record is sufficient for our review. Second, Moriarty's citation to the record on the issue of invited error is to the judgment and sentence. It does not support the theory that the State invited any error.

"A case is technically moot if the court can no longer provide effective relief." *State v. Hunley*, 175 Wn.2d 901, 907, 287 P.3d 584 (2012). This issue is not moot because Moriarty clearly has not completed his sentence. The trial court stayed the 30 days of electronic home monitoring pending the resolution of this appeal.

III.     THE TRIAL COURT ERRED BY AUTHORIZING THE ALTERNATIVE SENTENCE

The State argues that the trial court erred because it lacked the authority to authorize an alternative sentence because it convicted Moriarty of a violent offense. We agree.

Statutory construction is a question of law that we review de novo. *State v. Wentz*, 149 Wn.2d 342, 346, 68 P.3d 282 (2003). We must give effect to the legislative intent behind the statute. *State v. Paulson*, 131 Wn. App. 579, 589, 128 P.3d 133 (2006). Yet, we retain the ultimate authority to interpret a statute. *Wentz*, 149 Wn.2d at 346. Where a statute is unambiguous, we determine the legislative intent from the plain language of the statute. *Paulson*, 131 Wn. App. at 589.

A trial court may only impose a statutorily authorized sentence. *Paulson*, 131 Wn. App. at 588. Any action by the trial court that exceeds its authority is void. *Paulson*, 131 Wn. App. at 588. "A sentence imposed without statutory authority can be addressed for the first time on appeal, and this court has both the power and the duty to grant relief when necessary." *State v. Julian*, 102 Wn. App. 296, 304, 9 P.3d 851 (2000).

The Sentencing Reform Act precludes alternative confinement for violent offenders. RCW 9.94A.680; RCW 9.94A.734. Home detention may not be imposed for offenders convicted of a violent offense. RCW 9.94A.734(1)(a). Community service is an alternative to total confinement for "offenders convicted of nonviolent offenses only." RCW 9.94A.680. Assault in the second degree is a violent offense. RCW 9.94A.030(55)(a)(vii).

Because the trial court did not have the authority to sentence Moriarty to electronic home monitoring for the violent offense of assault in the second degree, we reverse the trial court's order authorizing electronic home monitoring and remand the case for resentencing.

We affirm in part, reverse in part, and remand the case for resentencing.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Melnick, J.

We concur:

Maxa, A.C.J.

Lee, J.