# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 57524-8-II |
| Respondent, | |
| v. | |
| TYRICE AARON HALL, | UNPUBLISHED OPINION |
| Appellant. | |

GLASGOW, J.—Tyrice Hall appeals his conviction of the murder of Tony[1] Haggard. On the day of the murder, Hall approached Andrea Criswell on the street. They did not know each other, but they walked together to a nearby restaurant parking lot. Criswell called her heroin dealer, Haggard, who soon arrived in his truck. Haggard was shot in the parking lot and later died of his injuries.

Just before the shots were fired, bystanders saw a man leaning into Haggard's truck. Though the bystanders recall seeing a woman, they explained that she was standing too far back to fire shots into the truck. After the shots were fired, bystanders saw a man, later identified as Haggard, fall out of the drivers' side door of the truck. One bystander then saw another man, who was holding a gun, bend down to search Haggard's pockets.

---

[1] Though Haggard's legal first name was Steven, we refer to him as Tony because that was his preferred name.

After Haggard was shot, Hall drove away in Haggard's truck. Criswell ran into the restaurant asking for help and a restaurant employee called police. When the police arrived, they found Criswell applying pressure to Haggard's wounds inside the restaurant.

Hall was later arrested and charged with Haggard's murder and his case proceeded to a jury trial. At trial, Criswell testified that Hall tried to rob Haggard and she saw Hall shoot into the truck at Haggard. Hall testified that Haggard and Criswell tried to rob him. He said Criswell pulled a gun on him outside the truck, that he wrestled her to the ground trying to disarm her, and then the gun accidentally went off during the struggle. Hall also testified that Criswell was standing in the parking lot pointing the gun at him while he drove away in Haggard's truck. Multiple eyewitnesses testified to details that tended to support Criswell's version of events and were inconsistent with Hall's testimony.

Hall appeals, arguing that the trial court abused its discretion by admitting in-life and autopsy photos of Haggard's face; refusing to strike an appeal to justice from Criswell's testimony; and allowing Haggard's daughter to wear a remembrance T-shirt bearing a photo of Haggard while in the gallery. Hall has submitted a statement of additional grounds (SAG) raising additional claims of error, including prosecutorial misconduct and speedy trial errors. Hall also asks that if we affirm his conviction, we remand for the trial court to strike the crime victim penalty assessment and DNA collection fee from his judgment and sentence due to his indigency.

We affirm Hall's conviction, and we remand for the victim penalty assessment and DNA fee to be stricken.

FACTS

I. UNDERLYING EVENTS

Andrea Criswell met Tyrice Hall when he approached her on the street. According to Criswell, Hall asked for her help buying heroin, but Hall maintained that Criswell wanted the drugs. They decided to walk together to a nearby restaurant and Criswell called her heroin dealer, Haggard, who soon arrived.

Haggard was shot and died at the restaurant. According to Criswell, Hall pulled a gun on Haggard and demanded Haggard's money and drugs, Haggard exited the truck through the driver's side door, then Hall shot three rounds through the truck at Haggard. Criswell was standing near Hall holding her dog at the time. Criswell said that after Haggard was injured and fell to the ground, Hall pointed the gun at him and again demanded money and drugs. Then, according to Criswell, Haggard threw the contents of his pockets onto the ground. Hall grabbed what he could, and drove away in Haggard's truck.

According to Hall, Criswell found out he had cash, and she and Haggard tried to rob him. Hall maintained that when he approached Haggard's truck, Haggard demanded money and Criswell pulled a gun on him from behind. Hall said that he tried to disarm Criswell and, in the ensuing struggle, Criswell accidentally shot Haggard. Hall also said that Criswell was aiming the gun at him while he drove away in Haggard's truck.

Several eyewitnesses recalled seeing a white truck outside the restaurant, hearing gunshots, and seeing an altercation that day. They did not recall seeing a woman holding a gun and at least two witnesses said the woman was holding her dog.

A restaurant customer using the drive-through saw a man standing outside the passenger door, leaning into the white truck. That customer heard two shots as the man leaned his head into the truck, then the customer saw another man seem to fall out of the driver's side of the truck to the ground. The drive-through customer also saw a woman standing outside the truck near its rear tire, but he said that the woman was too far back to have fired the shots into the truck.

Another customer, who was parked in the restaurant parking lot eating his lunch and talking on the phone, saw the incident through his own driver's side mirror. This customer saw a man walk toward a white truck and heard two male voices arguing as the man stood outside of the truck. This customer thought both men were on the passenger side of the truck when he heard gunshots and saw one man stumble away from the truck clutching his stomach and screaming, "[N]o." 3 Verbatim Rep. of Proc. (VRP) at 1062. The customer saw the injured man lying on the ground while a man with a goatee, who was holding a gun, bent over the injured man and took something from his pockets.

A restaurant employee saw a man leaning into the truck with a woman standing behind him holding her dog. The employee recognized the woman as a regular, but had never seen the man before. The employee heard gunshots as the man leaned further into the truck, then the employee saw the woman running away from the truck toward the restaurant while the man was still standing leaning into the truck. The employee then saw another man fall out of the truck's driver door.

After the shooting, Criswell ran to the restaurant to get help, asking employees for rags to apply pressure to Haggard's wounds. The employee recalled Criswell banging at the door of the restaurant, frightened, trying to get in, and later screaming for help. Other employees also recalled Criswell entering the restaurant, screaming and crying, and asking employees for help. Criswell

was still applying pressure to Haggard's wounds when police and paramedics arrived. When police asked Haggard who shot him, he responded, "I don't know." 4 VRP at 1426. Haggard later died of his injuries.

Police interviewed Criswell immediately after the shooting. She gave a detailed description of the shooter to law enforcement. Later that day, police found Haggard's truck in an alley about a mile away from the restaurant. Criswell then identified Hall as the shooter in a photo lineup and Hall was eventually arrested.

## II. JURY TRIAL

In December 2020, Hall was charged with first degree felony murder, first degree robbery, and unlawful possession of a firearm. He was convicted in July 2022 after a nine-day jury trial.

### A. Continuances

In July 2021, Hall filed a pro se motion to exercise his right to a speedy trial. Hall's attorney asked for a continuance shortly thereafter because a DNA analysis was not yet complete and he had only recently received out-of-state conviction records. Hall's attorney alerted the court to Hall's objection to the continuance. The trial court concluded that counsel needed more time to be prepared and granted the continuance over the defendant's objection. The court later granted five more continuances over Hall's objections after Hall's attorney argued he needed more time to prepare due to protracted discovery.

B.      Evidence

        1.      Admissibility of in-life and autopsy photographs

In preparation for trial, the State moved for "a general pretrial ruling that, assuming the State elicits the proper foundational testimony, photographs of the victim, in life and autopsy photographs, are relevant and not unduly prejudicial." Clerk's Papers (CP) at 31. The State did not identify or seek a ruling on specific images at that time. But the State did explain it was seeking admission of only one in-life photograph of Haggard alone, without family members or pets.

In opposition to the State's motion, Hall argued that in-life photos were unnecessary because Haggard's identity was uncontested and the minimal probative value of in-life photos was outweighed by prejudice. Specifically, Hall asserted that admission of the in-life photo was an excuse to have Haggard's grieving daughter testify so that she could lay foundation for admission of the photo. Hall nonetheless "conceded that the [proposed in-life] photos [we]re not particularly inflammatory" and that the trial court had discretion to admit an in-life photo or not. 1 VRP at 80. The State responded that identity of the victim was a fact it had to prove and it was entitled to do so in any way that was not overly prejudicial.

The court ruled that it would admit one in-life photo, provided that the photo offered was "relatively neutral" and "not inflammatory." *Id.* at 82-83. The parties and the court agreed that Haggard's daughter would not be allowed to testify about her grief or about anything other than the photo and Haggard's identity.

With respect to autopsy photos, Hall conceded that autopsy photos would be admissible but reserved the right to object to the photos as cumulative or overly prejudicial if necessary when offered. The trial court ruled that autopsy photos would generally be admissible if they illustrated

the medical examiner's testimony, provided that the photos offered were not particularly gruesome or repetitive.

2. Testimony of Kendra Haggard

Haggard's daughter, Kendra, and her mother arrived to court wearing a shirt bearing a photo of Haggard's face and the words "Rest in Paradise" on the day she was to testify. Ex. 238.[2] The State advised Kendra to cover the shirt while testifying, but believed wearing the shirt "should be okay" while in the gallery. 2 VRP at 441.

Hall asked court to order Kendra and her mother to cover up the shirt while in the courtroom because the shirt was an appeal to sympathy. The court explained that, in its view, they would be legally allowed to wear the shirt as long as it was a "simple remembrance" not advocating for an outcome. *Id.* at 442. The State asked for clarification about whether the court was ordering the shirt to be covered while Kendra was on the stand, and the court replied, "I think it's best that they don't have them at all. I don't require it. She can wear it if she wants, but I think it's a very bad idea." *Id.* at 443. Kendra covered up the shirt for the rest of the day, including while testifying.

Kendra testified briefly regarding her father's nickname and appearance. During Kendra's testimony, the State offered exhibit 181, an in-life photo of Haggard. Hall did not further object to the photo at that time. The photo showed Haggard with a goatee and with a neutral expression on his face, wearing dark clothing and standing alone in a doorway. The court admitted and allowed the State to publish the exhibit. During cross-examination, Hall asked Kendra whether she provided the photo to the medical examiner's office, and Kendra replied that she did not.

---

[2] We refer to Kendra by her first name to avoid confusion because she shares the last name Haggard.

The day after Kendra testified, she again arrived wearing the remembrance shirt. Hall renewed his motion to disallow the shirt and the trial court denied the motion. Kendra changed or covered up the shirt at some point before the end of the morning recess. The trial court made a record that Kendra was no longer wearing the shirt by the time proceedings resumed after the morning recess and noted that she was sitting at a "fairly extreme angle" from the jurors, in the opposite direction from the witness stand where the jurors would typically be looking. *Id.* at 672.

3.     Testimony of Andrea Criswell

The State called Andrea Criswell, who testified to her recollection of events as described above. She recalled that Hall, a stranger, approached her on the side of the road and asked if she knew where he could buy heroin. Criswell said that she answered, "Yes" and agreed to set up a transaction for Hall in exchange for some of the heroin. *Id.* at 594. Criswell testified that she walked with Hall to a restaurant and called Haggard, her heroin dealer of six months. Haggard agreed to come to the restaurant's parking lot with the drugs. When Haggard arrived, Criswell approached his truck to speak with him, then called Hall to join her on the passenger side of the truck. She was holding her dog at the time.

Criswell testified that then, Hall pulled a gun and told Haggard to "give him all of his sh*t." *Id.* at 613. Haggard immediately jumped out of the truck and took off running. Hall "instantly fired three rounds straight through the truck" and Haggard was hit in the hip and fell down. *Id.* at 619-20. Then, she testified that Hall approached Haggard, pointing the gun at him, and again told him to give him "all of his sh*t." *Id.* at 623. Haggard pulled out whatever was in his pocket and threw it at Hall. Hall grabbed everything and went to the truck and drove away.

Criswell testified that she then ran to the restaurant with Haggard to get help. She asked for a rag and applied pressure to Haggard's bleeding hip area until police and paramedics arrived and questioned her.

On cross-examination, Hall questioned Criswell about her crying throughout direct testimony Hall elicited testimony that Criswell was not "sobbing and heaving" during her pretrial interview. 2 VRP at 658. Hall asked whether she felt like she had "to put on a show" for Haggard's family. *Id.* Criswell denied this.

On redirect, Criswell testified that "today has a lot more weight" than the pretrial interview because it is the "actual trial." *Id.* at 728. The State then asked how Criswell felt talking about what happened to Haggard, and Hall did not object to the question. Criswell answered that the events surrounding Haggard's death were "extremely traumatic" and that she still thought about whether she could have possibly prevented him from dying that day. *Id.* at 729. Criswell went on to explain that the trial was significant because it meant "finally being able to bring justice to him and put it behind me and move on with my life. He didn't deserve to die." *Id.* Without giving a specific reason for the objection, Hall stated, "I'd object and ask to strike." *Id.* The court responded, "Let's have a new question," but the court did not strike any portion of the answer. *Id.*

Criswell's version of events was generally corroborated by the testimony of employees and customers of the restaurant who were present that day, as described above.

4.      Law enforcement witnesses

The State later called Detective Young, who was the first officer to arrive on the scene. Young explained that when he arrived, he saw Haggard lying on his back bleeding inside the restaurant with Criswell applying pressure. Young recalled that Criswell appeared very fearful and

emotional. Young removed Criswell and questioned her. Criswell was crying during the interview and expressed worry about Haggard.

The State also called medical examiner, Thomas Clark, who performed the autopsy on Haggard. Before Clark took the stand, Hall objected to admission of the photo of Haggard's face taken during the autopsy because it was substantially more prejudicial than probative and because Haggard's identity was not in dispute. The State responded that Haggard's facial hair was at issue because its prior witness, the customer eating his lunch in the restaurant parking lot, recalled a shooter with a goatee, and the autopsy photo showed Haggard did not have a goatee at the time of his death. The court indicated it would admit the photo so long as foundation was laid. The court acknowledged that the identity of the deceased person was not in dispute but concluded that the photo was relevant because it confirmed "who this photo and the subsequent [autopsy] photos" depicted and that the photo was not unfairly prejudicial under ER 403. 4 VRP at 1246.

During Clark's testimony, the State offered autopsy photos, including the photo showing Haggard's face. Hall stated, "No additional objection" *Id.* at 1260. The photo, which showed a close up of Haggard's face with one eye closed, was admitted and published. In the photo, Haggard had noticeable grey stubble covering his full beard area, not trimmed into a goatee. The State asked Clark, "Is this the individual [o]n which you conducted the autopsy?" and Clark responded affirmatively. *Id.* at 1262.

5.      Testimony of Tyrice Hall

After the State rested its case, Hall testified to his version of events as described above. He said that Criswell accidentally shot Haggard during a failed attempt at robbing Hall.

10

Hall testified that Haggard demanded money from him, and that when he refused to pay, he felt Criswell holding a gun at his back. Then, he reached into his pocket for money, but his cigarettes fell out of his pocket so he crouched down to pick them up. According to Hall, when he crouched down, the gun was positioned over his head or shoulder but not aimed at him.

Hall testified that he reached behind him in an attempt to break Criswell's arm, while Criswell was still holding the gun. On direct, he testified that they wrestled on the ground and that he could see Haggard leaning over him. On cross, he said he stood up from the crouching position and Criswell fell to the ground and he immediately started running. He then heard a gunshot and heard Haggard say "b*tch, you shot me." *Id.* at 1459. He heard another gunshot and Haggard started running away.

Hall testified that when he broke free from Criswell's hold, Criswell chased him around the back of the truck, still holding the gun. Hall explained that he then got into Haggard's truck and drove away, with Criswell aiming the gun at the truck from behind him. He pulled over and left the truck on the side of the road, then walked to a nearby bus stop and got on a bus. Several months later, Hall was contacted by law enforcement.

C.    Closing Arguments

Closing arguments on both sides generally focused on which version of events, Criswell's or Hall's, was more credible and consistent with the other evidence. The State described the testimony of the law enforcement witnesses and argued, "I submit to you that none of them had any motive to not be truthful with you when they were testifying about what it was that they did as part of this investigation." 5 VRP at 1558. The State said the witnesses "who were out in the parking lot [and] the employees, . . . similarly have no motive to lie about what they saw or heard."

11

*Id.* In contrast, Hall focused on Criswell's potential motivations and the ways in which her testimony differed from Hall's and the eyewitnesses' testimony.

In addition, the State in its closing reminded the jury, "Your job is to deliberate, consider the evidence that you've heard . . . combined with the law that the judge has just given you, and render a verdict in this case." *Id.* at 1550. The State reminded the jury that it "must . . . not base your verdict and your decision on things like sympathy." *Id.* The State also asked the jury to "remember that closing arguments, both mine and [defense counsel]'s, are not evidence." *Id.* at 1551.

D.      Jury Instructions

Prior to opening statements and again before closing arguments, the court instructed the jury to "reach your decision based on the facts proved to you and on the law given to you" rather than "sympathy, prejudice, or personal preference." CP at 141. The court also instructed the jury that statements made by lawyers are not evidence.

E.      Deliberations and Verdict

During a break in deliberations, a juror was eating lunch at the same restaurant where the prosecutor was dining, when the juror overheard the prosecutor's colleague say loudly that the prosecutor was "an excellent attorney." 5 VRP at 1650. The prosecutor saw the juror only after the comment was made and notified the court. The court asked defense counsel for his opinion on how to proceed, and Hall's attorney requested the juror be questioned.

When questioned, the juror answered that he remembered seeing and hearing the prosecutor and the colleague at lunch. The juror explained, "I believe what I heard [the colleague say] was that he was with the best trial lawyer for lunch." *Id.* at 1654. The court asked whether the

comment had any bearing on deliberations and the juror said, "Absolutely none whatsoever." *Id.* The court then determined no improper contact occurred and Hall's attorney expressed he was comfortable that the comment had no impact.

The jury reached a guilty verdict the same afternoon.

F.     Posttrial Proceedings

At a posttrial hearing regarding scheduling his sentencing, Hall asked the judge to entertain his pro se motion for a new trial. Hall argued that the prosecutor committed misconduct when the juror overheard the comment about her being an excellent attorney. Hall characterized the comment as a voucher of the prosecutor's credibility. The court heard argument on Hall's motion and considered its merits, ultimately denying the motion because the juror contact was unintentional, not a campaign to present extraneous evidence, the comment was unrelated to the evidence presented in Hall's trial, the comment did not vouch for the prosecutor's credibility, and the juror did not appear to be influenced.

The trial court ultimately imposed a standard range sentence and imposed a DNA collection fee and the victim penalty assessment. The court waived all other fees because the court found Hall to be indigent.

Hall appeals his conviction and the imposition of the DNA fee and the victim penalty assessment. Hall also filed a SAG for review.

ANALYSIS

I. EVIDENTIARY RULINGS

Hall argues that the trial court abused its discretion by admitting unfairly prejudicial in-life and autopsy photos of Haggard's face and by refusing to strike an appeal to justice from Criswell's

13

testimony. Hall contends that even if these errors individually do not require reversal, they cumulatively warrant reversal. We disagree.

A.      Review of Decisions Admitting Evidence

We review evidentiary rulings for abuse of discretion. *In re Welfare of M.R.*, 200 Wn.2d 363, 376, 518 P.3d 214 (2022). A trial court abuses its discretion when its decision is "'manifestly unreasonable,'" meaning no reasonable person would reach the court's conclusion, or if it "'rests on untenable grounds,'" meaning the court relied on facts not supported by the record or applied an incorrect legal standard. *Id*. (quoting *State v. Griffin*, 173 Wn.2d 467, 473, 268 P.3d 924 (2012)). If we determine the trial court abused its discretion, we next ask whether the error prejudiced the defendant. *Id.* The appellant must show there is a reasonable probability that the error affected the outcome of the trial. *Id.*

An appellant must make a specific objection to the challenged evidence in order to preserve the issue for appeal and our review is confined to the specific objection raised at trial. *State v. Kirkman*, 159 Wn.2d 918, 926, 155 P.3d 125 (2007); *State v. Guloy*, 104 Wn.2d 412, 422, 705 P.2d 1182 (1985). The party objecting to the evidence must give a reasonably definite statement to specify grounds for exclusion. *State v. Boast*, 87 Wn.2d 447, 451, 553 P.2d 1322 (1976). An evidentiary objection is insufficient if it does not alert the court to the real reason for the inadmissibility of the testimony. *Id.*

All evidence must be relevant to be admissible. ER 401. "Relevant evidence" is that which has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable." *Id.*

14

Relevant evidence is nonetheless inadmissible "if its probative value is substantially outweighed by the danger of unfair prejudice." ER 403. A danger of unfair prejudice exists when evidence is more likely to arouse an emotional response rather than a rational decision. *State v. Cronin*, 142 Wn.2d 568, 584, 14 P.3d 752 (2000). Weighing prejudice, courts consider whether a piece of evidence has the "capacity to inflame the jury or numb its sense of reason or logic." *Id.* Where a danger of unfair prejudice exists, it can be alleviated by a jury instruction, and we presume that jurors follow the court's instructions. *State v. Emery*, 174 Wn.2d 741, 766, 278 P.3d 653 (2012). Relevant evidence may also be excluded on the ground that it is a waste of time or cumulative of other evidence already presented. ER 403.

B.     Admission of the Photos in This Case

1.     In-life photo

Hall argues that the in-life photo was unfairly prejudicial and inadmissible even though standing alone it is "not particularly inflammatory." Br. of Appellant at 18. He contends the photo was cumulative and thus had little, if any, probative value. Hall argues that the photo prejudiced him because the State introduced it through Haggard's daughter as an appeal to sympathy. We disagree.

The trial court did not abuse discretion when it admitted the photo because it was relevant to identify the victim and was not unfairly prejudicial. Although Hall did not dispute the victim's identity, this does not bar the State from presenting evidence on that issue. Generally, even where a defendant offers to stipulate to an element of the crime charged, the "'State is not automatically precluded from presenting its evidence'" on that element and, "'[i]f the State does not agree to the stipulation, the issue remains open and the State can proceed to prove its case in the manner that

it sees fit.'" *State v. Taylor*, 193 Wn.2d 691, 697, 444 P.3d 1194 (2019) (internal quotation marks omitted) (quoting *State v. Pirtle*, 127 Wn.2d 628, 652, 904 P.2d 245 (1995)). This is so because "[a]llowing the defendant to 'plead out' of an essential element would indeed prevent the State from presenting a 'complete picture' of the events to the jury." *Pirtle*, 127 Wn.2d at 652. Thus, Hall's concession on the issue of Haggard's identity is not dispositive and the trial court could still consider the photo's relevance under ER 401 and potential unfair prejudice under ER 403.

Turning to relevance, here, the amended information identified Haggard as the victim, so identity had to be proven at trial. And there were conflicting accounts about who was trying to rob whom. Haggard's appearance was made *particularly* relevant because eyewitnesses spoke about the appearance of the people they saw in the parking lot at various times. For example, one witness recalled seeing a man with a goatee holding a gun and later bending over to search the pockets of the man who had been shot.

With respect to balancing prejudice against probative value under ER 403, the in-life photo contained nothing that would induce sympathy, it was a picture of Haggard standing in a doorway. Hall agrees the photo was not "inflammatory." Br. of Appellant at 18. He also conceded that the photo was not inflammatory below. And to the extent Hall's argument focuses on the sympathy Kendra's testimony would invoke, her testimony was succinct and it did not discuss her grief or her reaction to the crime being tried. Thus, Hall cannot show the trial court abused its discretion where the ruling reflected the proper balancing between prejudice and relevance.

Finally, Hall has not shown prejudice warranting reversal. Hall makes no argument about how this photo standing alone impacted the outcome of his trial; he argues only that it was an appeal to sympathy because it was offered during Kendra's testimony, and that cumulative error

prejudiced his outcome. But the jury is presumed to follow instructions, including the instruction not to rely on emotions or sympathies.

### 2. Autopsy photo

Hall also argues that the autopsy photo of Haggard's face was unfairly prejudicial and cumulative. He contends that the photo was cumulative of other evidence showing that Haggard's body was the one on which the autopsy was performed. We disagree.

To the extent Hall complains that the photo was unfairly prejudicial and cumulative, the court did not abuse discretion in admitting photo. The photo was not gruesome or graphic, and it was relevant to establishing identity. Moreover, Haggard's facial hair at the time of his death was relevant to the jury's understanding of the eyewitness testimony in this case. A restaurant customer testified that he saw a man with a goatee holding a gun, and although Haggard had a goatee in the in-life photo, he did not have a goatee in the autopsy photo. Therefore, the photo showing Haggard's lack of facial hair was probative of more than just the identity of the body being autopsied, but also to the question of which man was holding the gun when observed by eyewitnesses in the parking lot. Thus, the trial court did not abuse its discretion when it admitted the photo.

Finally, Hall again makes no argument about how this photo individually impacted the outcome of his trial, and any error in admitting the photo was cured by instructing the jury not to rely on emotion.

### C. Appeals to Justice

Hall argues that the court erred when it refused to strike the appeal to justice Criswell made in her testimony on redirect. He specifically relies on Criswell's statement, "this trial is finally

being able to bring justice to him and put it behind me and move on with my life. He didn't deserve to die." 2 VRP at 729.[3] The State contends that Hall failed to preserve this issue by not stating the basis for the objection below. We agree with the State.

Hall did not identify the ground upon which he objected to this testimony, but said only, "I'd object and ask to strike." *Id.* The context did not make clear that this objection was based on the reference to justice, especially because Criswell was giving a narrative response at the time.

Furthermore, even if the argument was not waived, Hall opened the door to the challenged testimony. Hall focused heavily on Criswell's emotions during cross-examination, drawing the jury's attention to her crying and questioning why she was more emotional testifying at trial than she was during pretrial interview and whether her different demeanor was "a show." *Id.* at 658. This put at issue whether Criswell could explain why she was more emotional during trial compared to the pretrial interview. The challenged comments directly flow from that line of questioning.

Finally, even if there were error, Hall has shown no prejudice warranting reversal. This was a single comment in a nine-day trial with many exhibits and extensive testimony. Hall does not explain how this comment alone could have influenced the outcome, and again, we presume the jury follows instructions, including not to rely on emotions.

---

[3] Hall asserts the court actually sustained his objection but erroneously overruled his motion to strike. However, this is not supported by the record because the court made no ruling, simply asked the State to ask a new question.

## II. COURTROOM MANAGEMENT

Hall argues that the trial court abused its discretion by allowing Kendra to wear a remembrance shirt bearing Haggard's face in the courtroom. We disagree.

### A. Management of Courtroom Spectators

We review courtroom management decisions for abuse of discretion. *State v. Schierman*, 192 Wn.2d 577, 645, 438 P.3d 1063 (2018). The defendant challenging a courtroom management decision bears the burden of showing the challenged conduct was inherently prejudicial. *Id.*

Courtrooms are constitutionally required to be open to the public, including to spectators. *See* WASH. CONST. art. I, § 22; U.S. CONST. amend. VI. A spectator's "silent showing of sympathy or affiliation in a courtroom, without more, is not inherently prejudicial." *State v. Lord*, 161 Wn.2d 276, 284, 165 P.3d 1251 (2007).

Spectator conduct is considered within the context of the whole trial and the broader range of inferences a reasonable juror could draw. *Id.* at 285. This includes the inference that a spectator's display of remembrance is simply a "natural reaction of grieving for a family member or friend." *Id.* at 286. For example, in *Lord*, several spectators wore buttons bearing a photo of a murder victim's face. *Id.* at 280. The Washington Supreme Court held that the buttons were not inherently prejudicial. *Id.* at 290-91. It reasoned that the jury was exposed to in-life and autopsy photos of the victim that were admitted into evidence and that the buttons "did not bear *any message* regarding guilt or innocence." *Id.* at 289-90.

### B. T-shirts Bearing Haggard's Image

Hall argues that the trial court abused its discretion when it failed to recognize that it had discretion to order Kendra not to wear a remembrance shirt bearing Haggard's image in the

courtroom. But any error in allowing the shirt was harmless because Hall has not shown that the shirt was inherently prejudicial. A remembrance that does not advocate for a particular outcome is not inherently prejudicial, and the shirt at issue here did not make a statement about Hall's guilt or innocence. Rather, like the buttons in *Lord*, the shirt was a simple display of grief and was likely to be interpreted as such by the jury. *See Id.* at 286-88. We are not convinced by Hall's argument that the shirt was made more prejudicial because the jury knew Kendra was a grieving family member after she testified. Indeed, the jury's knowledge of Kendra's relationship to Haggard actually *bolsters* the permissible inference that the shirt was a natural expression of Kendra's grief and was not a plea for a particular outcome in Hall's trial.

Moreover, the jury was exposed to the shirt for a very short time, if at all. Kendra covered the shirt on the first day of trial, including while testifying. Although she wore the shirt for a brief period on the second day of trial, she was persuaded by the court's urging to change or cover the shirt. As a result, Kendra wore the shirt in the gallery for approximately two hours, and it is unclear whether the jury could even see the shirt during that time. The court made a record that Kendra was sitting in the back corner of the gallery and jurors would need to look in the opposite direction of the witness stand at an extreme angle to see her. Therefore, in the context of the courtroom scene, the shirt did not create any inherent prejudice that would impact Hall's right to a fair trial. Accordingly, we reject Hall's challenge to the trial court's courtroom management decision.

### III. CUMULATIVE ERROR

Hall argues that evidentiary and courtroom management errors prejudiced him cumulatively by appealing to the jury's emotion. We disagree.

20

Hall has failed to show any error, and he has made no showing that the jury was influenced by sympathy. We presume the jury followed its instructions, including the instruction to avoid sympathy or prejudice, and thus, we presume that the jury weighed the evidence and made credibility determinations that led to its verdict.

Here, disinterested bystanders testified to observations that largely support Criswell's version of events but were incompatible with Hall's. Restaurant employees and customers saw a man leaning into a truck as shots were fired. A customer saw a man with a gun searching Haggard's pockets. Employees and law enforcement saw Criswell panicking and trying to help Haggard while he bled. None of the eyewitnesses saw Criswell holding a gun, at least one witness said she was holding her dog, and their testimony placed Criswell in a position from which she could not have fired shots into the truck. Indeed, the other witnesses were present with a full view of the events, and would have seen if Criswell pulled a gun on Hall and accidentally shot Haggard, then chased Hall around the back of the truck, then aimed the gun at Hall as he drove away.

The jury had to choose whether to find Criswell's version or Hall's version credible; it chose Criswell's, which was supported by the testimony of other eyewitnesses. Hall has failed to show that cumulative errors affected the verdict.

## IV. SAG

Hall first argues that his right to a speedy trial and CrR 3.3 were violated when his attorney agreed to a continuance over his objection. It is within the trial court's discretion to accept counsel's waiver of speedy trial over a defendant's objection for good cause to ensure effective representation and a fair trial. *State v. Campbell*, 103 Wn.2d 1, 691 P.2d 929 (1984). Here, the trial court properly granted continuances over Hall's objections for good cause shown due to protracted

21

discovery. Hall's attorney informed the court of Hall's objection and the court considered the outstanding discovery and made a proper record of the reason for granting continuances. Therefore, Hall has not shown error or ineffective assistance of counsel and was not prejudiced because the delays benefitted Hall's defense.

Hall also argues that he did not have timely access to the State's discovery and that if he had access to expert reports earlier, he would have hired his own expert to dispute the reports. Though we are not obligated to search the record in support of Hall's claims, our review of the record indicates the State kept defense counsel informed of outstanding discovery, including processing times for DNA samples and phone extraction data. *See* RAP 10.10(c). Moreover, the trial court granted each of Hall's continuance requests related to discovery delays, thus curing any potential prejudice resulting from late discovery. Hall therefore has not shown a prejudicial discovery violation.

Hall goes on to argue that the prosecutor improperly commented on a witness's character for truthfulness in its closing argument. Prosecutors have wide latitude to argue inferences in closing statements, including regarding witnesses' credibility, but they may not express personal beliefs regarding "the veracity of a witness." *State v. Thorgerson*, 172 Wn.2d 438, 443, 258 P.3d 43 (2011). We examine challenged comments in light of the complete circumstances of the trial, including the court's instructions. *State v. McKenzie*, 157 Wn.2d 44, 53-54, 134 P.3d 221 (2006). "Prejudicial error does not occur until such time as it is clear and unmistakable that counsel is not arguing an inference from the evidence, but is expressing a personal opinion." *Id.* at 54 (quoting *State v. Papadopoulos*, 34 Wn. App. 397, 400, 662 P.2d 59) (emphasis omitted).

Here, the prosecutor argued that the State's eyewitnesses had "no motive to lie about what they saw or heard" and that none of its law enforcement witnesses "had any motive to not be truthful" when testifying. 5 VRP at 1558. In light of the complete circumstances of the trial, the complained of comments here were permissible arguments within the latitude afforded to prosecutors in closing arguments and do not constitute vouching.

Hall also argues that the prosecutor had ex parte juror contact because a juror overheard another attorney stating that the prosecutor was an "[e]xcellent" attorney. SAG at 9. The prosecutor informed the court of this accidental contact and the court explored the incident thoroughly, including interviewing the juror. Hall's attorney was comfortable that the comment had no impact on deliberations. Hall raised a renewed concern about the contact in a pro se motion for a new trial, orally presented to the court after the verdict. The court considered its merits, ultimately denying the motion and explaining to Hall the legal basis for its ruling. Hall has presented no credible argument as to why the court's conclusion was in error. Nor can he show that the innocuous comment could have prejudiced him considering the evidence presented at trial. We therefore decline to review the argument.

Similarly, Hall makes no credible argument to support his claim that five orders contain "errors or mistakes" because his attorney wrote "defendant objects" on the signature line. SAG at 12-13. Hall agrees that he objected to the orders and does not explain what error he now complains

of. Therefore, we decline to review this claim of error and conclude that Hall has put forth no arguments in his SAG that entitle him to relief.[4]

## V. Legal Financial Obligations

Hall asks that we remand for the victim penalty assessment and the DNA collection fee to be stricken based on recent statutory amendments. The State concedes that Hall is entitled to have these fees stricken. We accept the State's concession and remand for the trial court to strike these fees from Hall's judgment and sentence.

## CONCLUSION

We affirm Hall's conviction and remand for the trial court to strike Hall's victim penalty assessment and DNA collection fee.

---

[4] Hall makes additional arguments in his SAG that would require facts outside the record and thus are not properly raised in this direct appeal. To the extent he relies on facts outside the record, a personal restraint petition is the appropriate means to raise such issues. *See State v. McFarland*, 127 Wn.2d 322, 338, 899 P.2d 1251 (1995).

57524-8-II

A majority of the panel having determined that this opinion will not be printed in the

Washington Appellate Reports, but will be filed for public record in accordance with RCW

2.06.040, it is so ordered.

Glasgow, J.

We concur:

Veljacic, A.C.J.

Price, J.