IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | No. 39416-6-III |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| JASON D. AYERS, a/k/a JASON DEE | ) | |
| AYERS, | ) | |
| | ) | |
| Appellant. | ) | |

PENNELL, J. — Jason Ayers appeals multiple convictions for child rape and

molestation committed against his stepdaughters, A.S., C.J., and S.K.,[1] and one count

of second degree assault against S.K, committed with a knife. We affirm.

---

[1] To protect the privacy interests of victims or witnesses who were minors at the time of any event in this case, we refer to them by their initials throughout this opinion. *See* Gen. Order 2012-1 of Division III, *In re Use of Initials or Pseudonyms for Child Victims or Child Witnesses* (Wash. Ct. App. June 18, 2012), https://www.courts.wa.gov/ appellate_trial_courts/?fa=atc.genorders_orddisp&ordnumber=2012_001&div=III.

FACTS

*Background*

Jason Ayers became romantically involved with the mother of A.S., S.K., and C.J. in 2005, when all three girls were under the age of 10. Mr. Ayers later married the girls' mother. Both before and during the marriage, Mr. Ayers lived with the family in several different Spokane residences. While at their initial Spokane residence, the three sisters shared a bedroom. Mr. Ayers would regularly visit the girls' room at night and, armed with the advantages of access and power, target one of them for sexual assault. All three girls were subject to Mr. Ayers's attacks. And each of the three had reasonable suspicion about the extent of Mr. Ayers's activities with the others. Even when not the subject of a particular night's attack, the girls could each detect Mr. Ayers's presence by his smell and, based on their own experiences, they recognized the sounds associated with the sexual abuse.

Mr. Ayers did not confine his assaults to the girls' bedroom. He molested and raped the girls during bath time and while using in the family's hot tub. He also molested the girls while covered with a blanket in the living room, watching television. As was true of the bedroom incidents, the girls were often present during each others' attacks and were able to recognize what was happening.

2

It took several years for the sisters to open up about the abuse. Early attempts at disclosure were either rebuffed or resulted in punishment. In 2017, by this time an adult, A.S. reported Mr. Ayers's conduct to law enforcement. S.K. and C.J. followed suit. In 2018, Mr. Ayers was finally arrested and initially charged with six counts of first degree rape of a child, three each against A.S and S.K. He was ultimately charged with ten counts of varying degrees of child rape, and three counts of first degree child molestation, relating to all three sisters. Mr. Ayers was also charged with one count of second degree assault with a deadly weapon against S.K. Each charge carried two special allegations: (1) that the crimes were committed as part of an ongoing pattern of sexual abuse of the same victim under the age of 18 and manifested by multiple incidents over a prolonged period of time, and (2) that Mr. Ayers used his position of trust, confidence or fiduciary responsibility to facilitate the commission of the offense.

*Severance and ER 404(b) pretrial motions*

Prior to trial, Mr. Ayers filed a motion under CrR 4.4(a)(1) to sever charges. He asked the court to sever the counts pertaining to each victim and to exclude each victim's allegations against him from the other victims' trials under ER 404(b). The State opposed severance and moved for admission of other act evidence under ER 404(b). The evidence the State sought to admit covered various uncharged allegations that the

3

State proffered as common plan or scheme evidence. The trial court held an extended

evidentiary hearing on the severance and ER 404(b) issues and considered testimony from

several witnesses, including A.S., S.K., and C.J.

A.S. testified that while living in Spokane she shared a bedroom with C.J. and S.K.

The sisters had a nightly routine where, after dinner, they would each take their turn in

the bath and then go to bed. The school attended by A.S. and her siblings often had lice

outbreaks, so the girls regularly had their hair checked and combed out with a special

shampoo while in the bath. A.S. testified Mr. Ayers was usually the one to bathe the

girls and comb through their hair, and that she, S.K., and C.J. were examined for lice

more regularly than the other children in the house. A.S. testified that Mr. Ayers would

sexually abuse her while she was in the bath.

A.S. further recalled Mr. Ayers would tell her mother he was going to tuck the

girls into bed, and then would lay with one of them each night and engage in sexual

assaults, rotating between her, S.K., and C.J. According to A.S., Mr. Ayers also sexually

assaulted her while partially covered with a blanket and watching television in the living

room. She was also raped when Mr. Ayers sat her on his lap in a hot tub. A.S. saw S.K.

and C.J. in similar situations with Mr. Ayers—under a blanket in the living room and also

on his lap in the hot tub—from which she deduced they were also being abused.

4

During C.J.'s pretrial testimony, she also described sharing a bedroom with her sisters and stated that Mr. Ayers would come into the room at night and assault the three girls. She knew it was Mr. Ayers because "[h]e had a distinct smell of grease and oil from the cars that he would work on." 1 Rep. of Proc. (RP) (Sept. 12, 2022) at 84-85; *see* 4 RP (Oct. 3, 2022) at 1518. C.J. recalled her sisters were sometimes in the same room when Mr. Ayers assaulted her. She also testified she could hear when Mr. Ayers would get into one of her sister's beds. Consistent with A.S.'s testimony, C.J. described Mr. Ayers assaulting her in the bathtub and while under in a blanket in the living room. C.J. witnessed Mr. Ayers sitting next to A.S. in a similar way with a blanket covering them and would notice there was movement under the blanket. She did not remember seeing anything similar occur between Mr. Ayers and S.K.

C.J. recalled Mr. Ayers would have A.S. go into the hot tub with him and not let anyone else in, and would see them huddled close together. There were also times she recalled being in the hot tub with A.S. and Mr. Ayers while A.S. either sat on Mr. Ayers's lap or beside him. C.J. testified that she could not see, but "could tell" that Mr. Ayers was doing something inappropriate with A.S., stating, "When something happens to you, you kind of just know the body language of the people around you. I knew my sister's body language, and I could tell when she was uncomfortable, and her being uncomfortable was

5

the same way that I felt, so I could just tell." 1 RP (Sept. 12, 2022) at 98. She did not

remember if Mr. Ayers did anything inappropriate to her in the hot tub, stating "I blocked

out a lot." *Id.*; *see* 4 RP (Oct. 3, 2022) at 1510.

Like that of her sisters, S.K.'s pretrial testimony described Mr. Ayers's routine

of coming into the sisters' bedroom at night and "making his rounds" where he "would

either start with [her] or start with one of [her] sisters." 1 RP (Sept. 13, 2022) at 127. S.K.

could not see everything Mr. Ayers did to her sisters, but she saw movement under the

bed covers and sometimes saw an outline of Mr. Ayers hands down one of her sister's

pants and could hear sighs. S.K. also described sexual assaults during bath time and while

covered with a blanket, watching television in the living room. S.K. remembered seeing

A.S. and C.J. also sitting next to Mr. Ayers on the couch with a blanket covering them.

On one occasion, S.K. recalled walking into a room with C.J. laying on top of Mr. Ayers

on a bed underneath a blanket, and her sister's underwear was on the floor near the bed.

S.K.'s pretrial testimony included allegations of physical abuse by Mr. Ayers.

However, she did not discuss any incidents involving being attacked by a knife.

The trial court denied Mr. Ayers's motion for severance. In its oral ruling, the

court addressed the strength of the evidence as to each victim, the cross-admissibility of

the evidence, the appropriateness of a limiting instruction requiring the jury to consider

each count separately, the clarity of Mr. Ayers's defense as to each victim, and judicial economy. The court determined that all the factors weighed in favor of a joint trial, though the court gave the least weight to judicial economy.

The court also ruled it would admit much of the State's bad act evidence under ER 404(b).[2] The court determined Mr. Ayers's "acts of abuse against each of the victims—both charged and uncharged—was part of a common scheme or plan" to engage in criminal sexual abuse. Clerk's Papers (CP) at 452. As such, the evidence was admissible under ER 404(b) for noncharacter purposes. The court similarly ruled it would allow the State to present evidence of Mr. Ayers's assaultive conduct against uncharged victims.

Jury selection began on September 21, 2022, and ended on September 28. On September 27, during voir dire, Mr. Ayers orally renewed his motion to sever "based on the fact that we're having such trouble getting a jury." 2 RP (Sept. 27, 2022) at 966. The court denied the motion.

At the end of voir dire on September 28, Mr. Ayers again renewed his motion to sever. The jury had not yet been sworn and opening statements had not yet occurred.

---

[2] The court excluded, pursuant to ER 404(b), evidence of a protection order that had been issued against Mr. Ayers. Clerk's Papers at 458.

His renewal was made in light of the difficulty in seating a jury, and based on an

indication by some in the jury pool that they might struggle with impartiality or bias

against Mr. Ayers due to the sheer number of charges against him. Again, the court

denied the motion, deferring to its prior rulings, and adding that "while there were

a number of jurors who did indicate that, they were not selected for this panel."

3 RP (Sept. 28, 2022) at 1159-60.

   That same day, on September 28, the jury was empaneled and sworn in, and the

parties presented opening statements. Mr. Ayers did not thereafter renew his motion to

sever the charges.

*Trial*

   At trial, A.S., S.K., and C.J. testified consistent with their testimony during the

pretrial hearing. In addition, S.K. described the event that formed the basis of the State's

second degree assault charge. S.K. was nine years old at the time of the incident and was

in the bedroom by herself. Mr. Ayers came into the room, took off S.K.'s pants, and

forcibly raped her. S.K. fought back and Mr. Ayers became angry. Mr. Ayers spanked

S.K. and then stormed out of the room. Shortly thereafter, Mr. Ayers came back into the

room, now armed with a kitchen knife. Mr. Ayers proceeded to rape S.K. again and, in

the process, sliced her genital area with the knife.

The State also presented testimony from Mr. Ayers's son, who lived with the family during the time periods recounted by the three sisters. The son testified that A.S. "was like the prized child," that Mr. Ayers would take her with him everywhere he went, and that Mr. Ayers did not want A.S. to have friends, especially boyfriends. 3 RP (Sept. 28, 2022) at 1263-66. The son testified to witnessing inappropriate incidents between Mr. Ayers and A.S. He recalled one time when Mr. Ayers made an up-and-down hand gesture to A.S. similar to masturbating and then motioned to go to the bedroom with her. A.S. became "standoffish," but eventually went into the bedroom and they closed the door. *Id*. at 1268-69. The son testified A.S. and Mr. Ayers would often be in a room alone together with the door closed.

Mr. Ayers's son also recalled events he witnessed in the hot tub between Mr. Ayers and A.S.:

> Yes. I ended up stop using the hot tub because it happened multiple times. It would just be me, A.S. and [Mr. Ayers] in the hot tub, and it would be nighttime. A.S. would end up sitting on his lap, and then she would lean forward and there would be like a back and forth type motion with her whole body. I wouldn't feel comfortable. I didn't know, like, what to say or how to talk or anything, so I would just look down at the water and—
> . . . .
> All in all, I would just feel awkward, and so I would splash the water around and then eventually just get out because I didn't—I didn't feel comfortable around what was happening.

*Id*. at 1278-79.

9

At the time he witnessed the events in the hot tub, Mr. Ayers's son was 12 years old. He testified that it was only after he reached high school age that he realized the motion he observed at age 12 was consistent with sexual activity.

The jury convicted Mr. Ayers on all pending charges and returned aggravated circumstances findings for each count.[3]

*Posttrial motions*

More than 30 days after entry of the verdict, Mr. Ayers filed a motion under CrR 7.4(a)(3) to arrest judgment, or in the alternative, for a new trial pursuant to CrR 7.5(a)(2)-(3). The motion was based on an e-mail received from Mr. Ayers's son. In the e-mail, Mr. Ayers's son retracted his trial testimony and claimed the prosecution forced him to testify through threats of jail.

The court denied Mr. Ayers's motion after holding an evidentiary hearing and considering testimony from Mr. Ayers's son. The court found the son's recanted testimony not credible, while the trial testimony was credible. The court subsequently sentenced Mr. Ayers to a total term of 474 months in prison.

Mr. Ayers timely appeals.

---

[3] Count 14, a charge of first degree child molestation involving C.J., was dismissed on agreement of the parties during trial due to insufficient evidence.

ANALYSIS

On appeal, Mr. Ayers's contentions are grouped as follows: (1) the trial court abused its discretion in denying the motion to sever charges pertaining to S.K. from those pertaining to A.S. and C.J., (2) the prosecution engaged in misconduct during closing argument by vouching for the witnesses and commenting on facts not in evidence, and (3) the trial court abused its discretion when it denied Mr. Ayers's motion for a new trial based on newly discovered evidence. We address each claim in turn.

*Severance*

Mr. Ayers argues the trial court abused its discretion by denying his pretrial motion to sever the charges involving S.K. from the charges involving A.S. and C.J. According to Mr. Ayers, severance was appropriate because the respective charges involved distinct acts and presented prejudicial evidence that allowed the jury to draw impermissible propensity inferences. The State argues Mr. Ayers failed to adequately preserve this issue for appeal. The State has the better argument.

Offenses that are of the same or similar character may be joined in a single charging document under CrR 4.3, and shall be consolidated for trial unless the trial court orders severance pursuant to CrR 4.4. CrR 4.3.1(a). Generally, a defendant must move for severance of offenses prior to trial. CrR 4.4(a)(1). "If a defendant's pretrial motion for

11

severance was overruled [they] may renew the motion on the same ground before or at the close of all the evidence. Severance is waived by failure to renew the motion." CrR 4.4(a)(2). When a severance motion is renewed, we will review denial of severance for manifest abuse of discretion. *State v. McCabe*, 26 Wn. App. 2d 86, 95, 526 P.3d 891, *review denied*, 1 Wn.3d 1032, 534 P.3d 806 (2023). This standard necessarily confines our review to the evidence before the court at the time of renewal. *See State v. Bluford*, 188 Wn.2d 298, 310, 393 P.3d 1219 (2017).

It is arguable that Mr. Ayers failed to renew his severance motion as required by CrR 4.4(a)(1). While Mr. Ayers reasserted his severance motion prior to trial and during voir dire, he did not do so after the jury was sworn or after the State began its presentation of evidence. The purpose of renewing a pretrial severance motion is to allow the court "an opportunity to assess whether there is actual prejudice based on the evidence presented." *McCabe*, 26 App.2d at 94-95. If the defendant renews a severance motion before the court has heard *any* additional evidence, renewal is meaningless. Given this circumstance, it would appear that a defendant who renews a severance motion prematurely, before it can serve any helpful purpose, should be treated the same as one who fails to renew a severance motion altogether.

12

But regardless of whether Mr. Ayers renewed his severance motion as required by CrR 4.4(a)(1), Mr. Ayers's severance argument still fails to qualify for review on the merits. Mr. Ayers contends that, in denying his motion to sever the charges, the trial court failed to consider that the charges involving S.K.—which included the second degree assault charge—differed greatly from the charges against A.S. and C.J. This argument differs from what was presented to the trial court in the context of Mr. Ayers's severance motion. It also relies on facts that were not in the record at the time of the trial court's ruling. Given these differences, Mr. Ayers has not demonstrated that the trial court abused its discretion in denying his motion to sever. After all, "a judge cannot abuse [their] discretion based on facts that do not yet exist." *Bluford*, 188 Wn.2d at 310. Whether the trial court would have granted a renewed motion to sever based on the arguments raised on appeal is not a matter that has been preserved for appellate review. The trial court's severance ruling must therefore be affirmed.

Related to his severance argument, Mr. Ayers argues the trial court erred by allowing evidence of S.K.'s allegations against Mr. Ayers to be presented during a trial that also involved charges involving A.S. and C.J. He argues that S.K.'s allegations constituted other act evidence, governed by ER 404(b). We disagree. Because the trial court did not abuse its discretion in allowing S.K.'s allegations against Mr. Ayers to be

13

presented at the same time as the charges involving A.S. and C.J., S.K.'s allegations did not constitute "other act" evidence as contemplated by ER 404(b). Rather, S.K.'s allegations were properly on trial as direct evidence of the crimes charged. *See* 5 KARL B. TEGLAND, WASHINGTON PRACTICE: EVIDENCE LAW AND PRACTICE § 404.11, at 500 (6th ed. 2016) ("Evidence that is, without question, directly probative of the crime charged is not restricted by [ER] 404(b).").

*Prosecutorial misconduct*

Mr. Ayers contends the prosecuting attorney committed misconduct during summation by (1) improperly vouching for A.S. and C.J., and (2) misstating facts not in evidence by suggesting Mr. Ayers sexually abused A.S. "'100 times'" and "'400 times.'" Appellant's Opening Br. at 39 (citing 5 RP (Oct. 11, 2022) at 2199, 2206, 2223, 2252-54). We address each claim in turn.

*Vouching*

A prosecutor commits misconduct by improperly vouching for the credibility of a witness. *State v. Robinson*, 189 Wn. App. 877, 892-93, 359 P.3d 874 (2015). "Vouching may occur in two ways: the prosecution may place the prestige of the government behind the witness or may indicate that information not presented to the jury supports the witness's testimony." *State v. Coleman*, 155 Wn. App. 951, 957, 231 P.3d 212 (2010).

14

"A prosecutor places the prestige of [their] office behind a witness when they express a personal belief in the veracity of testimony." *State v. Stotts*, 26 Wn. App. 2d 154, 167, 527 P.3d 842 (2023) (citing *In re Pers. Restraint of Glasmann*, 175 Wn.2d 696, 706, 286 P.3d 673 (2012) (plurality opinion)). To constitute vouching, it must be "'clear and unmistakable'" that the prosecution is expressing a personal opinion rather than making an inference from the record. *State v. McKenzie*, 157 Wn.2d 44, 54, 134 P.3d 221 (2006) (emphasis omitted) (quoting *State v. Papadopoulos*, 34 Wn. App. 397, 400, 662 P.2d 59 (1983)). Attorneys are given wide latitude to make reasonable inferences based on the facts presented at trial, "including evidence respecting the credibility of witnesses." *State v. Thorgerson*, 172 Wn.2d 438, 448, 258 P.3d 43 (2011).

Mr. Ayers maintains that the prosecuting attorney vouched for A.S. and C.J. at three separate times during closing argument. The first took place during the prosecutor's initial argument and the second and third occurred during rebuttal. We quote each in turn.

First, Mr. Ayers points to the following argument regarding A.S.:

> And by that point in [A.S.]'s life, she truly believed she was in love with Mr. Ayers. And I'll ask you to think about that when you're weighing [A.S.]'s credibility and ask yourselves whether you believe that is a description that somebody making up this entire ordeal out of whole cloth would include.

Is that the thing that a person fabricating a story would say, that they loved the person who was doing this to them?

5 RP (Oct. 11, 2022) at 2206.

Second, Mr. Ayers complains of the following argument regarding C.J.:

[C.J.] didn't have a lot of details to offer you. But what she did tell you is that she's tried to block this out. That's how she dealt with it, and that's not a very surprising way to deal with trauma.

And again if you're lying, why block out memories? All you really have to do to get somebody in trouble it is say it happened once or twice. That still gets you in trouble. And if she wanted to invent two episodes completely from whole cloth, wouldn't that be more compelling in a way?

Or at least in some liar's mind, wouldn't that be more compelling than saying: I blocked it. I don't remember, but I know this happened a bunch of different times, vaguely?

Why would she say her face was covered with a blanket instead of just saying: Yeah, I saw him right there? Why make the extra leap of saying: I smelled cigarettes, and there were fingernails, and I smelled engine grease? Because real life has limitations on your ability to perceive. Those limitations was these girls.

*Id*. at 2252-53.

Finally, Mr. Ayers points to the following statement about A.S. and C.J.:

The last question I'll ask you, is it more reasonable to believe that these girls, some of them—not [C.J.]—I'm sorry—not [S.K.], but that [A.S.] and [C.J.] would lie about what was going on, while Mr. Ayers was literally in the house with them, while they were literally living with a woman who is giving them no support as the mother, and while they literally had no physical evidence to offer the investigators?

Is it more reasonable that they would lie then under those conditions, or is it more reasonable that they're lying now, under oath in court, as adults, when they literally have nothing to gain from it at all.

16

*Id*. at 2253-54.

None of these arguments constituted vouching. The prosecutor merely presented reasons why the jury should find the victims' testimony credible. With respect to the initial argument, the prosecutor simply asked the jury to consider whether the types of statements made by A.S. were consistent with someone who was lying. With respect to the second and third statements, these were made in rebuttal. At that point, the prosecutor was responding to Mr. Ayers's attacks on the victims' credibility. The prosecutor's arguments at this point were properly directed at giving the jury reasons for rejecting Mr. Ayers's lines of attack. Mr. Ayers's vouching claims fail.

*Facts not in evidence*

While attorneys are entitled to argue reasonable inferences based on facts presented at trial, they are prohibited from making "prejudicial statements that are not sustained by the record." *State v. Dhaliwal*, 150 Wn.2d 559, 577, 79 P.3d 432 (2003). The propriety of statements made during summation is reviewed "in the context of the whole argument, the issues of the case, the evidence addressed in argument, and the instructions given to the jury." *State v. Scherf*, 192 Wn.2d 350, 394, 429 P.3d 776 (2018).

17

Mr. Ayers references two points during summation where he claims the prosecutor improperly argued facts not in evidence. We set forth each below, emphasizing the specific statements giving rise to Mr. Ayers's arguments.

The first statement occurred during the prosecutor's discussion of the court's unanimity instruction:

> Part of the instruction that reads—that can be so hard to read or understand is that instruction the Court talked to you about being unanimous about a single episode.
>
> In some of these cases we talked about, it can be hard to be unanimous about a single episode because none of these girls is capable [of] saying "On May 1st, 2008, I stayed home from school, Mr. Ayers came into my room at about 4:00 p.m.," and said, "This first he took off his shirt, then he took off his shoes, he told me I looked stupid, and then he raped me, and it lasted this long," et cetera.
>
> What the girls remember, sadly, as a factor of this abuse, is just a long chain of rapes. And it's pretty understandable how they could blend into each other and how it's hard to separate the details from one to the next, which is why I asked those questions, describe to me what he would do, and then, would this happen more than once.
>
> *This could have happened a hundred times to* [A.S.] *over the years* that Mr. Ayers was with her. She's incapable of counting. We're only going to try to get two charges out of those however many charges because I guess, in a way, it's the only fair way to present the evidence to you folks.
>
> You can't find a whole bunch of different offenses with no dates and not much separation between them in terms of detail. So I'm asking you to find two for a couple of these counts, where we know it happened multiple times. And just what's critical is that you all agree, even if you don't know the exact dates, that you're relying on the same episodes, the one described and then one other.

5 RP (Oct. 11, 2022) at 2198-2200 (emphasis added).

18

The second statement occurred during the prosecutor's discussion of the special

allegation that Mr. Ayers had engaged in a pattern of abuse:

> You also heard the discussion of a pattern of abuse, and this is where you can hold Mr. Ayers accountable. *Even though we can't charge him with 400 counts of sexual misconduct, you can say that this allegation has been proved*; that even though you're not going to find him guilty for each independent evidence, that his behavior is different than other offenders because it occurred over a prolonged period of time and it included multiple instances of abuse of a child.
> And that's what all of these girls described happening, except for [two uncharged victims], but nothing's charged regarding them.

*Id*. at 2223 (emphasis added).

Neither statement referenced facts not in evidence. A.S. testified that Mr. Ayers

had abused her multiple times over a period of several years and in so many different

locations she had no way of knowing precisely how many times it occurred. C.J. and S.K.

also testified that they were subject to Mr. Ayers's abuse multiple times over several years

while growing up. The prosecutor's argument that the abuse likely occurred hundreds of

times was a fair inference from the record. The argument was not improper.[4]

---

[4] Because none of the prosecutor's arguments were improper, we reject Mr. Ayers's claim that trial counsel was ineffective for failing to object. *See In re Pers. Restraint of Davis*, 152 Wn.2d 647, 748, 101 P.3d 1 (2004) (A litigant cannot demonstrate ineffective assistance of counsel through a failure to object if they "cannot show that any objection would have been granted by the trial court.").

*Denial of motion for new trial*

Mr. Ayers challenges the trial court's denial of his motion for new trial based on his son's recantation of his trial testimony. Under CrR 7.5(a)(3), the trial court may grant a new trial based on "[n]ewly discovered evidence material for the defendant, which the defendant could not have discovered with reasonable diligence and produced at the trial." We review a trial court's decision to deny a motion for new trial for abuse of discretion. *State v. Roche*, 114 Wn. App. 424, 435, 59 P.3d 682 (2002). Abuse of discretion occurs where the court's decision is based on untenable grounds or is manifestly unreasonable. *Id.* at 435; *State v. Castellanos*, 132 Wn.2d 94, 97, 935 P.2d 1353 (1997).

The trial court did not abuse its discretion in denying Mr. Ayers's motion. "When considering whether newly discovered evidence will probably change the trial's outcome, the trial court considers the credibility, significance, and cogency of the proffered evidence." *State v. Statler*, 160 Wn. App. 622, 632, 248 P.3d 165 (2011). That is what happened here. The court heard testimony regarding Mr. Ayers's proffer of newly found evidence and determined it was not credible. This determination alone was sufficient to deny Mr. Ayers's motion. *See id.* at 632-33. We will not second guess the trial court's credibility findings on appeal. *Davis*, 152 Wn.2d at 680.

20

No. 39416-6-III
*State v. Ayers*

CONCLUSION

The trial judge did an admirable job of fairly adjudicating Mr. Ayers's case and allowing him to develop his record. There is no basis for relief on appeal. The judgment of conviction is affirmed.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

Pennell, J.

WE CONCUR:

Lawrence-Berrey, C.J.

Staab, J.

21